## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | CASE NO: 22-11060 |
| | § | |
| LARRY LOUIS COUPEL AND | § | CHAPTER 13 |
| NATALIE LOMBAS COUPEL, | § | |
| | § | SECTION A |
| DEBTORS. | § | |
| | § | |

| | | |
|---|---|---|
| ANTHONY G. FALTERMAN, BONNIE | § | |
| F. SWILLER, MARK S. FALTERMAN, | § | |
| PEGGY F. PLAKOTOS, MARY | § | |
| ELIZABETH G. SHAVER, MICHAEL | § | |
| J. SMALL, JAMES I. SMALL, AND | § | ADV. NO. 23-01028 |
| ESTER CHAISSON FALTERMAN, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| LARRY L. COUPEL AND NATALIE A. | § | |
| COUPEL, | § | |
| | § | |
| DEFENDANTS. | § | |

### MEMORANDUM OPINION AND ORDER

On June 22, 2016, the above-captioned plaintiffs (collectively, the "Falterman Heirs") filed a Petition against Larry and Natalie Coupel (the "Coupels") in Louisiana state court regarding an ongoing dispute over approximately sixteen acres of land in Napoleonville, Louisiana (the "State Court Action"). [ECF Doc. 1]. On September 14, 2022, the Coupels filed a voluntary chapter 13 bankruptcy petition in this Court, which stayed the State Court Action pursuant to 11 U.S.C. § 362(a). [No. 22-11060, ECF Doc. 1].

The Falterman Heirs initially moved this Court to lift the stay and allow the State Court Action to proceed. [No. 22-11060, ECF Doc. 83]. On August 31, 2023, however, the Falterman

1

Heirs removed the State Court to the United States District Court for the Eastern District of Louisiana, which referred the matter to this Court. [ECF Doc. 2]. This Court consolidated the contested motion to lift the stay with the adversary proceeding. [ECF Doc. 4].

This Court held a two-day trial to decide the claims alleged in the adversary proceeding. The Court qualified Anthony Falterman as an expert on title examination and Randal Grip as an expert on photogrammetry for the Falterman Heirs and considered testimony from both. The Court qualified Allen Woodard as an expert on surveying for the Coupels. The Court also heard testimony from Henry Blanchard, Henry Gautreaux, Patrick Falterman, Cody Coupel, Natalie Coupel, Emily Bradford, and Dexter Ford. During the trial, the parties stipulated to the admission of Plaintiff Exhibits A1–18, B1–5, C, D, and E into evidence. [ECF Doc. 29]. The Court admitted Defendant Exhibits A–E and G into evidence. [ECF Doc. 30]. The Court also admitted into evidence the Defendants' demonstrative survey as edited by Mr. Woodard as Defendant Exhibit N.

Pursuant to Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure, the Court now makes the following findings of fact and conclusions of law and concludes, among other things, that the disputed property belongs to the Falterman Heirs.

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. With all parties' consent, [ECF Doc. 9], the matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT[1]

### Specific Witness Credibility Determinations

The Court finds attorney Anthony Falterman to be a highly credible and earnest expert witness in Louisiana state law title examination. The Court finds Mr. Falterman's testimony to be reliable and helpful to the Court to understanding the ownership history of the Disputed Property (defined below).

The Court finds photogrammetry expert Randal Grip to be a credible and knowledgeable witness. Mr. Grip's testimony regarding historical aerial photography of the Disputed Property was very helpful in assisting the Court to resolve the disputes before it.

The Court finds Henry Blanchard to be a generally credible and earnest witness. He appeared to answer questions posed to him truthfully and to the best of his recollection. The Court finds Henry's testimony to be helpful in understanding the history of the development of the Road (defined below).

The Court finds Henry Gautreaux to be a generally credible and earnest witness. He appeared to answer questions posed to him truthfully and to the best of his recollection. The Court finds his testimony to be useful as to his own property dispute with the Coupels, but otherwise of limited use to the Court in resolving the matters before it.

The Court finds Patrick Falterman to be a credible and earnest witness. He appeared to answer questions posed to him truthfully and to the best of his recollection.

---

[1] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

The Court finds Cody Coupel's and Emily Bradford's testimony to be useful as to the current state of the Disputed Property, but to be of limited use otherwise due to their lack of direct knowledge regarding ownership of the Disputed Property.  Thus, the Court gives little weight to their testimony.

The Court finds Natalie Coupel to be an earnest witness.  The Court finds her testimony as to the timing of the Coupels' property purchases to be credible, but does not find her testimony to be credible to the extent her testimony constitutes legal analysis of immovable property transfers or title analysis, as she has no formal education or training in either.

The Court finds Dexter Ford, a title surveyor and abstractor, to be a generally earnest witness, but not credible or helpful to the Court in resolving the property ownership disputes before the Court.  Mr. Ford was unfamiliar with the location of the Disputed Property, performed no independent title examination himself, and the record does not reflect that he included the Disputed Property in any abstract he may have provided to the Coupels.  Thus, the Court gives no weight to Mr. Ford's testimony.

The Court recognizes that Alan Woodard is or may have been certified as a land surveyor and licensed by the Louisiana Board of Engineers and Land Surveyors.  But Mr. Woodard was also unfamiliar with the location of the Disputed Property and he performed no independent title examination himself.  The Court further finds that Mr. Woodard's testimony regarding his personal history to be, at best, inconsistent, and, at worst, perjurious, which damages his overall credibility as a witness.  Thus, the Court gives no weight to his testimony.

### The Disputed Property

The parties dispute title and possession of an approximately sixteen-acre parcel of land located in Assumption Parish, located about halfway between the Attakapas Canal and Highway

401 (the "<u>Disputed Property</u>") (see Figures 1 & 2).[2] The parties have referred to the Disputed Property as the "dogleg" or "triangle," *see* Hr'g Tr. 13:24–14:09; 123:15–:17; 165:18–:22; 170:17–:18 (Mar. 17, 2025), or even a "rectangle," *see* Hr'g Tr. 46:14–:16 (Mar. 18, 2025). The Disputed Property and surrounding properties are landlocked and historically have only been accessible via a road running northwest from Highway 401 (the "<u>Road</u>"). The Road has existed at least since the 1830s and, as of the early 1900s, was used to move cattle across the Falterman family's property and to access other landlocked neighboring properties. *See* Hr'g Tr. 35:14–38:3; 97:3–102:10 (Mar. 17, 2025); Plaintiffs Ex. D. Originally the Road stopped at the Disputed Property. *See* Hr'g Tr. 35:14–38:3; 74:24–95:25; 97:3–102:10 (Mar. 17, 2025); Plaintiffs Ex. D. In the 1950s, after the Falterman family began leasing the Disputed Property and surrounding land for mineral exploration, Humble Oil and Refining Company ("<u>Humble Oil</u>") extended the Road past the Disputed Property to the Attakapas Canal. *See* Hr'g Tr. 35:14–51:24; 97:3–102:10 (Mar. 17, 2025). Around the same time, Humble Oil also built a road past the Disputed Property, running southwest and perpendicular to the Road to access an existing oil well (the "<u>Oil Field Road</u>"). *See* Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

---

[2]      In the early 1800s, the Attakapas Canal served as the major waterway in Napoleonville and was used as a highway to transport goods to the Mississippi River, destined for Baton Rouge or New Orleans.



*Figure 1: Google Image showing the approximate location of the Disputed Property*

### The Louisiana Territory and Historical Methods for Property Descriptions

In 1682, the French colonized much of modern-day Louisiana included in what was known as the Louisiana Territory. The French eventually ceded Louisiana to Spain in 1762, and Spain controlled the territory until the early 1800s when it retroceded the territory to the French in 1801. In 1803, the French sold the Louisiana Territory to the United States of America.

As a result of the shifting control over the Louisiana Territory, property titles employed competing methods for identifying and describing property boundaries. The French identified property boundaries by referring to the surrounding landowners. But as property was transferred by succession, sale, or donation, property titles were not necessarily updated to reflect changes in neighboring landowners. The Spanish took a difference approach, dividing property into long, skinny tracts of land that fronted roads or major waterways such as rivers, canals, or bayous and

6

measured the boundaries of tracts in "arpents." An arpent is 191.831 feet, making one square arpent is approximately 84% of an acre. A standard Spanish-created tract measured 1 to 2 arpents wide and 12 to 13 arpents long.

The English had long surveyed property by "metes and bounds," using a series of measurements and physical landmarks to identify boundaries. Although the original colonies employed that system, the fledgling United States devised a more consistent method of dividing public lands for sale as the United States' territory expanded. Under the Public Land Survey System ("PLSS") created through the passage of the Land Ordinance of 1785 by the Continental Congress, public lands were divided into sections, townships, and ranges. Under the PLSS, one section is 640 acres. Parts of the Louisiana Territory were divided under that system in the 1830s and early 1840s, resulting in Louisiana property boundaries being identified through a mix of French, Spanish, English, and American traditions.

### The Quarter Section

In 1846, Orcino Falterman[3] (Anthony Falterman's great, great, great grandfather) purchased 159 acres in Section 2, Township 14 South, Range 13 East from the United States government for $199.38 (the "Quarter Section"). *See* Plaintiff Ex. A2; Hr'g Tr. 21:21–29:03 (Mar. 17, 2025).[4] The Quarter Section included the Disputed Property. *See* Plaintiff Ex. A2; Hr'g Tr. 21:21–29:03 (Mar. 17, 2025).

In 1849, following Orcino's death, Orcino's son, Ursin Falterman Jr., purchased the Quarter Section at a succession sale. *See* Hr'g Tr. 21:21–29:03 (Mar. 17, 2025). In 1857, after

---

[3]     Orcino Falterman is the Spanish spelling of his name. Orcino also answered to the name "Ursin," which is the French spelling. *See* Hr'g Tr. 22:04–:11 (Mar. 17, 2025).

[4]     Orcino intended to purchase one-quarter of a section which should have been 160 acres, but the deed he received provided for only 159 acres. *See* Hr'g Tr. 16:11–27:12 (Mar. 17, 2025.

Ursin Jr.'s death, his wife, Emily Falterman, and his brother, Francois Falterman, purchased the Quarter Section via succession sale. *See* Plaintiff Ex. A2; Hr'g Tr. 21:21–29:03 (Mar. 17, 2025). On May 22, 1901, Francois Falterman sold his interest in the Quarter Section to Orville Falterman (Anthony Falterman's great-grandfather). *See* Plaintiff Ex. A1; Hr'g Tr. 21:21–29:03 (Mar. 17, 2025).

### The Disputed Property Is Separated from the Quarter Section

In either 1904 or 1905, Emily Falterman and Orville Falterman sold the Disputed Property to Ernest Breaux, thus separating the Disputed Property from the Quarter Section. *See* Plaintiff Ex. A3; Hr'g Tr. 29:15–34:05 (Mar. 17, 2025). Ernest Breaux was related to the Falterman family in two ways. First, he was Orville Falterman's brother-in-law: Ernest Breaux married Alice Gravayar and Orville Falterman married Marie Gravayar. Second, Ernest's brother, Camille Breaux, married Zuma Falterman, Ursin Falterman Jr.'s daughter. *See* Hr'g Tr. 29:15–34:05 (Mar. 17, 2025).

The deed provided the following property description of Emily's and Orville's undivided halves which used elements of both the French and Spanish systems of describing property boundaries:

> This undivided half each of a certain tract of land situated in the Parish of Assumption on the Attakapas Canal, about eight miles from the town of Napoleonville. Said tract of land is about twelve arpents in the rear from the Attakapas Canal, the whole of which is said to contain about sixteen acres, more or less, bound in the front by lands of Elie Westerman in the rear by lands of Hanson Brothers, towards Bayou Lafourche in front by lands of Ernest Braud towards Lake Verret by land of Austin Barbier and Harrison Borgeau . . . .

Plaintiff Ex. A3; *see also* Hr'g Tr. 29:15–32:19 (Mar. 17, 2025).

On December 1, 1906, Ernest Breaux mortgaged the Disputed Property to Sheldon Falterman (Anthony Falterman's grandfather) to secure repayment of a $260 loan. *See* Plaintiff

8

Ex. A4; Hr'g Tr. 32:20–33:02 (Mar. 17, 2025). Ernest Breaux eventually defaulted on repayment of the loan and Sheldon Falterman initiated foreclosure proceedings on the Disputed Property. *See* Plaintiff Ex. A5; Hr'g Tr. 32:20–34:05 (Mar. 17, 2025). On May 30, 1914, Sheldon purchased the Disputed Property at the sheriff's sale. *See*; Hr'g Tr. 32:20–34:05 (Mar. 17, 2025). The description of the Disputed Property used in the mortgage and the sheriff's sale deed is identical to that used in the initial sale of the Disputed Property from Emily Falterman and Orville Falterman to Ernest Breaux. *Compare* Plaintiffs Ex. A3, *with* Plaintiffs Ex. A5; Hr'g Tr. 29:15–34:05 (Mar. 17, 2025).

### Ownership of the Disputed Property Since 1914

The Disputed Property has remained in the Falterman family since it was purchased by Sheldon Falterman at the sheriff's sale in 1914. *See* Plaintiffs Exs. A1–A5; Hr'g 23:23–36:18 (Mar. 17, 2025). Sheldon's two sons, Lester Falterman (Anthony Falterman's father) and Tenance Falterman, inherited the Disputed Property after Sheldon's death. Following Lester's and Sheldon's deaths, the Falterman Heirs inherited the Disputed Property. Neither Lester Falterman's nor Tenance Falterman's succession has been completed. Nothing in the record shows that the Disputed Property was transferred via succession, sale, or donation since the 1914 sheriff's sale.

Sheldon Falterman first used the Disputed Property as a pasture for cattle. *See* Hr'g Tr. 34:03–35:22. In the 1940s and into the 1950s, he leased the Disputed Property to farmers to grow sugar cane. *See id.* Starting in 1938, Sheldon Falterman also began leasing the Disputed Property to various mineral exploration companies. Between 1938 and 2003, the Falterman family executed

nine mineral leases for use of the Disputed Property.[5] Sheldon himself executed five of those leases:

(i)     Four-year lease dated June 9, 1937, for use of the Disputed Property to Frank Buttram, a land man. *See* Plaintiff Ex. A6; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(ii)    Lease dated March 18, 1942, for use of the Disputed Property and a separate parcel (totaling 20 acres) to Union Oil of California. *See* Plaintiff Ex. A7; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(iii)   Five-year lease dated October 26, 1948, for use of the Disputed Property and a separate six-acre property to I. R. Price. *See* Plaintiff Ex. A9; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(iv)    Eight-year lease dated  May 26, 1952, for use of the Disputed Property and a separate six-acre property to Humble Oil. *See* Plaintiff Ex. A11; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(v)     Five-year lease dated January 21, 1960, for use of the Disputed Property and a separate six-acre property to Humble Oil. *See* Plaintiff Ex. A12; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

Following Sheldon's death, his heirs continued to lease the Disputed Property:

(i)     Lester Falterman, Rooks Falterman, Douglas Falterman, and Bessie Welsh executed a lease  dated January 26, 1965, for use of the Disputed Property and a separate six-acre property to Humble Oil. *See* Plaintiff Ex. A13; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(ii)    Lester Falterman, Rooks Falterman, Douglas Falterman, and Bessie Welsh executed a three-year lease dated August 12, 1969, for use of the Disputed Property and a separate 6-acre property to James A. Mattax. *See* Plaintiff Ex. A14; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(iii)   Esther Falterman (widow of Douglas Falterman) executed a three-year lease dated March 10, 1997, for use of the Disputed Property and a separate nine-acre property to Saltex Exploration, Inc. *See* Plaintiff Ex. A15; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

(iv)    Lester Falterman executed a three-year lease dated  September 5, 2003, for use of a thirty-acre property (including the Disputed Property), to Talbot Properties, Inc. *See* Plaintiff Ex. A17; Hr'g Tr. 38:04–51:24 (Mar. 17, 2025).

---

[5]     Sheldon also leased other portions of the Quarter Section for mineral exploration during this period as well. *See* Plaintiff Exs. A8, A10 & A16.

Historic aerial photographs of the Disputed Property, publicly available through the U.S.

Geological Survey ("<u>USGS</u>"), further demonstrate how the Disputed Property was used between

1965 and 1998 and support Anthony Falterman's testimony regarding his family's use of the

Disputed Property.  A 1965 USGS map (Figure 2) shows the Disputed Property as the white

rectangular plot located in the center of the map and running perpendicular to the Oil Field Road.

*See* Plaintiffs Ex. B1; *see also* Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  Randal Grip, the Plaintiffs'

photogrammetry expert, explained that the white areas indicate agricultural usage.  *See* Plaintiffs

Ex. B1; Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).



*Figure 2: 1965 USGS Map of the Disputed Property.  Plaintiffs Ex. B1.*

Three versions of the USGS map of the Disputed Property dated October 31, 1970, also

show the Disputed Property in the center of the map.  *See* Plaintiff Exs. B2, B4 & B5.  Two

orthophotos (colored infrared aerial photos) of the Disputed Property dated October 31, 1970

(Figure 3), further demonstrate usage of the Disputed Property.  *See* Plaintiffs Exs. B2 & B4; *see*

*also* Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  Mr. Grip explained that the pink coloration on the orthophotos indicates agricultural activity whereas the turquoise coloration indicates that land has been cleared.  *See* Plaintiffs Exs. B2, B4 & B5; Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  Mr. Grip identified certain ground features, likely a ditch or a fence, running across the Disputed Property. *See* Plaintiffs Exs. B2, B4 & B5; Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  Mr. Grip also identified a ditch and evidence of farming activity in the upper right corner of the Disputed Property.  *See* Plaintiffs Exs. B2, B4 & B5; Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).



*Figure 3: USGS Map of the Disputed Property Dated October 31, 1970.  Plaintiffs Ex. B2.*

Napoleonville and much of southeastern Louisiana was devastated by a major flood in 1973, which rendered much of the existing farmland unusable.  *See* Hr'g Tr. 110:23–121:15 (Mar. 17, 2025).  As a result, the Falterman family ceased all farming activity on the Disputed Property. *See id.*  The final USGS map dated February 4, 1998 (Figure 4) demonstrates how the topography of the Disputed Property changed between 1973 and 1998.  *See* Plaintiffs Ex. B3.  Mr. Grip identified the same ground features and the ditch that were visible in the 1970 USGS map.  *See*

Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  The 1998 image shows how the formerly cleared areas and farmland had become overgrown because the Falterman family had ceased farming the land in the years after the flood.  *See* Plaintiffs Ex. B3; Hr'g Tr. 74:24–95:25 (Mar. 17, 2025).  Nevertheless, the Falterman family continued using the Disputed Property as a campground and for hunting.  *See* Hr'g Tr. 110:23–121:15 (Mar. 17, 2025).  As an example, Patrick Falterman (Anthony Falterman's brother) built a wooden structure which remained on the Disputed Property for years.  *See* Hr'g Tr. 52:06–58:14; 110:23–121:15 (Mar. 17, 2025).



*Figure 4: USGS aerial photo of the Disputed Property dated February 2, 1998.  Plaintiffs Ex. B3.*

With the exception of one year, the Falterman family has paid the property taxes for the Disputed Property since Sheldon Falterman purchased the property in 1914.  *See* Hr'g Tr. 34:06–35:13.  Natalie Coupel paid the property taxes on the Disputed Property in 2014, but the Falterman Heirs resumed paying thereafter.  *See* Plaintiffs Ex. E.

### The Coupel Property

On September 25, 2001, for the sum of $65,0000, the Coupels purchased from Kenneth and Michelle Thibodeaux a 1.036-acre property located at 1474 Highway 401, Napoleonville, Louisiana, which serves as the site of their current residence (the "2001 Deed").  *See* Defendants Ex. E; Hr'g Tr. 136:03–:04; 137:21–138:1 (Mar. 17, 2025).  On April 15, 2003, for the sum of $22,000, the Coupels purchased two additional tracts of land from Kenneth and Michelle Thibodeaux:  (i) an eleven-arpent tract (1 arpent x 11 arpents) and (ii) a five-arpent tract (1 arpent x 5 arpents) (the "2003 Act of Sale").  *See* Defendants Ex. A.[6]  The eleven-arpent tract is described in the 2003 Act of Sale as follows:

> A certain tract of land situated in the Parish of Assumption, Louisiana, on the Attakapas Canal, about eight (8) miles from Napoleonville, and measuring one arpent front to said Canal, on a depth of 11 acres or 13 arpents, more or less, bounded above by lands, now or formerly, belonging to Cierville Bourg, and below by lands formerly of Joseph Guidry, now to Edgard Breaux.

*Id.*  The Thibodeauxs warranted in the 2003 Act of Sale that they acquired ownership of the two tracts of land from "Jeanette B. McCulla, et als, by act of sale dated December 4, 1991 and duly recorded in the conveyance records of the Parish of Assumption, Louisiana, in COB #177, p. 91 under Entry #165468."  *Id*.

Natalie Coupel testified that she and her husband believed that they own the Road via the 2003 Act of Sale, and that she believed that members of the general public as well as mineral exploration companies who continued to use the Road without the Coupels' permission were trespassers.  *See* Hr'g Tr. 139:17–140:24 (Mar. 17, 2025).  So in 2006, the Coupels sought affirmation regarding ownership of the Road and asked Jeanette B. McCulla and seven of her relatives (the "McCulla Relatives" who conveyed the two tracts of land to the Thibodeauxs in

---

[6]     The five-arpent tract of land is not at issue or relevant to this adversary proceeding.

14

1991) to sign a quitclaim deed to clear title of the Road (the "2006 Quitclaim Deed"). *See* Hr'g Tr. 139:1–140:24; 157:07–158:16 (Mar. 17, 2025); Defendants Ex. B. The record is silent regarding who drafted the 2006 Quitclaim Deed, but according to Natalie Coupel:

> [The McCulla Relatives] didn't understand the purpose of the sale [*i.e.*, 2006 Quitclaim Deed] because they said that the road was originally a part of the property, that Humble Oil was the one who later on made it into a road. But because there was no description of the road included on my titles, that is why I had to go back to the [relatives] to correct this.

Hr'g Tr. 139:8–13 (Mar. 17, 2025). The two tracts of land are described in the 2006 Quitclaim Deed thus:

> 1) A certain tract of land together with all buildings and improvements thereon situated in the Parish of Assumption, State of Louisiana, on the Attakapas Canal, on the right descending bank of said Attakapas Canal, about eight miles from Napoleonville, on a depth of 11 acres or 13 arpents, more or less, bounded above by lands, now or formerly belonging to Cierville Bourg, and below by land formerly of Joseph Guedry now to Edgard Breaux; together with all of the buildings and improvements, rights, ways and privileges thereon and thereto belonging and appertaining.

> Being the same property acquired by Emile Aucoin from the Heirs of David Boudreaux in 1880 and recorded in COB 34 at page 143 in the records of Assumption Parish. Further being the same property whereby Stanley Aucoin inherited 1/5 interest from his parents and then acquired full ownership per separated sales: Henry Aucoin to Stanley Aucoin, January 22, 1944, recording in COB 75, at page 582; Mr. Lillie Aucoin, wife of W.T. Loftus to Stanley Aucoin, April 22, 1947, recorded in COB 78 at page 291, and lastly from deed from Adeline Aucoin Barras, et als to Stanley Aucoin, March 30, 1949 recorded in COB 79 at page 678.

> Being the same property inherited by vendors herein per a Judgment of Possession in the Succession of Stanley Aucoin, Probate No. 4588, and recorded in COB 176 in the records of Assumption Parish.

> Being the separate and paraphernal property of all vendors herein.

> Being the same property in which Jeanette McCulla acquired an interest per an Act of Donation dated March 25, 1991, from Eunice Christoforo filed in the records of Assumption Parish.

Being the same property in which Joan B. Landry, Carol B. Benetiz and David Marshall acquired an interest per an Act of Donation dated April 15, 1991, from Odile A. Marshall filed in the records of Assumption Parish.

2) A certain tract of land situated in the Parish of Assumption, on the right descending bank of Bayou Lafourche and on the north side of the Attakapas at a distance of about seven miles from the Town of Napoleonville measuring one arpent front by a depth of five arpents, more or less, bounded above or North by land of vendor, below or south by land of Earnest Braud, in the rear by lands of John Houston, in front by land of Emile Aucoin.

Being the same property acquired by Emile Aucoin from Camile Breaux on June 3, 1904, and recorded in Assumption Parish.  This property acquired by Emile Aucoin was never distributed per a Judgment of Possession, a Succession was never opened on Emile Aucoin, the vendors herein are heirs of Emile Aucoin.

Being the separate and paraphernal property of all vendors herein.

Defendants Ex. B.

Although the 2006 Quitclaim Deed signed by the McCulla Relatives represents that "Sellers now have reason to believe that through title or acquisitive prescription, they or their ancestors in title own or may own an interest in certain property to the south of the property previously transferred by them to Kenneth P. Thibodeaux and Michelle R. Thibodeaux as described herein," Defendants Ex. B, Natalie Coupel testified that the McCulla Relatives communicated to her that they knew of no other property that could be conveyed by the 2006 Quitclaim Deed other than the property listed in the 2003 Act of Sale transferring property from the Thibodeauxs to the Coupels.  *See* Hr'g Tr. 159:10–160:2 (Mar. 17, 2025).  Nevertheless, the McCulla Relatives executed the 2006 Quitclaim Deed specifically to convey whatever interest they may have in the Road to the Coupels:

> To the extent that the Sellers own an interest in such property, for and in consideration of the price and sum of Ten and 00/100 ($10.00) Dollars, cash in hand paid, receipt of which is hereby acknowledged, and full acquittance and discharge given, Sellers do hereby sell, transfer, assign, quitclaim, release and relinquish under LARRY L. COUPEL (Social Security Number [XX]) and NATALIE L. COUPEL (Social Security Number [XX]), married to each other, both domiciled in and residents of Assumption Parish, Louisiana, whose address is

1474 Highway 401, Napoleonville, Louisiana 70390, all of the right, title and interest which they own or may own in and to the following described property, to-wit:

> Any and all land/property situated from the center line of an existing ditch to the south of the property owned or previously owned by Sellers, said ditch being along the south side of a road/lane known by some as Kafoury Lane, and then going north to the northern boundary of the property owned or previously owned by Sellers, including but not limited to the road/lane known by some as Kafoury Lane.

> The property above described is located in Assumption Parish, State of Louisiana, on the Attakapas Canal, about eight miles from Napoleonville, Louisiana, beginning on La. Highway 401 and running in a westerly direction, including all property adjacent to the property of Stanley Aucoin sold by his heirs to Kenneth P. Thibodeaux and Michelle R. Thibodeaux on December 4, 1991, and now belonging to Larry L. Coupel and Natalie L. Coupel.

Defendant Ex. B. After executing the 2006 Quitclaim Deed, the Coupels began to assert title and possession of the Road, which led to pushback from neighbors. *See, e.g.*, *Coupel v. Kfoury (In re Coupel)*, No. 25-30048, 2025 WL 3092766 (5th Cir. 2025); *Kfoury v. Coupel*, No. 2010-1254, 2011 WL 766960 (La. App. 1 Cir.), *writ denied*, 63 So. 3d 1000 (La. 2011). In 2011, the Coupels hired Alan Woodard to survey the property they believed they purchased from the Thibodeauxs and the McCulla Relatives. *See* Hr'g Tr. 146:18–148:04 (Mar. 17, 2025). Neighbors objected to Woodard's attempts to survey their property. *See id*.

But it was only when the Falterman Heirs filed the State Court Action in June 2016 did the Coupels devise their theory that the Disputed Property was included in the property purchased from the Thibodeauxs in the 2003 Act of Sale. *See* Hr'g Tr. 141:15–142:4 (Mar. 17, 2025) ("I hired an abstractor, Dextor Ford, and I got him to do the abstract on the Falterman family's property. We wanted to see if [Anthony Falterman] had a legitimate claim."). In addition to hiring Mr. Ford, Natalie Coupel testified that she went to the courthouse to conduct independent title

research and, over time, "accumulated quite a bit of legal boxes of documents." *See* Hr'g Tr. 141:21–:14 (Mar. 17, 2025).

Dexter Ford testified that he did not perform a full abstract, but rather, spent ten days to "update" the information given to him by Natalie Coupel. *See* Hr'g Tr. 06:18–15:04 (Mar. 18, 2025). Mr. Ford further testified that he received a "box of [legal] documents" from a lawyer who had worked for the Coupels and was tasked with "try[ing] to find whatever. . . was missing" from the title ancestry of the Coupel property. *See id.*. Mr. Ford testified that Natalie Coupel instructed him to "focus[his] efforts" on a "small triangle piece of property," but he could not identify or describe the Disputed Property at trial with any particularity. *See id.* He described his work on the project as "difficult" because "a lot of [the property descriptions] dealt with large tracts of property." *See id.* The record is unclear as to which properties Mr. Ford included in his "update." *See id.* Indeed, his abstract was not introduced at trial and Ford was unable to verify that any of the documents in evidence were the same as those he observed in Natalie Coupel's "box of documents." *See id.*

Meanwhile, on August 8, 2016, Mr. Woodard produced his survey of the Coupels' property (the "Woodard Survey"). *See* Hr'g Tr. 15:19–64:05 (Mar. 18, 2025); Defendants Ex. G. Mr. Woodard purportedly surveyed the property transferred to the Coupels as described in the 2001 Deed and the 2003 Act of Sale, but that is where the credibility of the Woodard Survey ends. At trial, Mr. Woodard failed to identify the correct location of the Disputed Property on his survey after affirmatively answering that he was aware of its location. *See* Hr'g Tr. 40:01–42:25 (Mar. 18, 2025); Defendant Ex. N. Mr. Woodard opined that the 2006 Quitclaim Deed conveyed additional property to the Coupels, thereby extending their property past the 11-arpent strip described in the 2003 Act of Sale. *See* Hr'g Tr. 15:19–64:05 (Mar. 18, 2025). But he had no

18

foundation for that opinion as he did not independently verify that the McCulla Relatives owned any property outside of that conveyed in the 2001 Deed and the 2003 Act of Sale.  *See id*.  Natalie Coupel testified that she relied on the Woodard Survey to assert her present claim of ownership of the Disputed Property.  *See* Hr'g Tr. 146:4–147:4; 151:5–15 (Mar. 17, 2025).  But given the lack of foundation for Mr. Woodard's survey as well as his problematic testimony regarding his substance abuse and incarceration history, the Court must entirely disregard the Woodard Survey and Mr. Woodard's testimony.

The 2003 Act Of Sale conveying an eleven-arpent tract of land does not include or reference the Disputed Property:

> A certain tract of land situated in the Parish of Assumption, Louisiana, on the Attakapas Canal, about eight (8) miles from Napoleonville, and measuring one arpents front to said Canal, on a depth of 11 acres or 13 arpents, **more or less**, bounded above by lands, now or formerly, belonging to Cirville Bourg, and below by lands formerly of Joseph Guedry, now to Edgard Breaux.  Together with all buildings and improvements, rights, ways privileges and servitudes thereon and thereunto belonging and appertaining.

Defendant Ex. A (emphasis added).  Nevertheless, the Coupels now claim that the phrase "more or less" included in the description of the eleven-arpent tract means that more property—specifically the Disputed Property—was transferred via the 2003 Act Of Sale than is expressly identified in the instrument.  According to Natalie Coupels' testimony, two documents collected by Natalie Coupel from parish public records form the basis for that assertion, one dated 1880 and one dated 1904, and both allegedly involving property transfers made to Emile Aucoin.  *See* Defendants Exs. C & D; Hr'g Tr. 141:15–146:9 (Mar. 17, 2025).  According to Natalie Coupel, she interpreted those documents to indicate that properties transferred to Emile Aucoin included the Disputed Property and became part and parcel of the Aucoin estate that was eventually sold to the Thibodeauxs by the McCulla Relatives in 1991 and then to the Coupels in 2003.  *See* Hr'g Tr. 141:15–146:9; 149:21–153:4 (Mar. 17, 2025).  The Court admitted Defendants Exhibits C & D

into evidence with no objection; however, the documents are not certified copies of public documents and are illegible.  *See* Defendants Exs. C & D.  Indeed, neither Natalie Coupel nor her counsel could point to language in either the 1880 or 1904 property transfers that indicate that the Disputed Property was transferred to Emile Aucoin.  *See* Hr'g Tr. 141:15–144:5; 145:11–146:2 (Mar. 17, 2025).

The Coupels' son, Cody Coupel and his partner, Emily Bradford, testified that the Coupel family has used the Disputed Property for limited purposes since the 2003 Act of Sale; specifically the Coupel family erected deer stands, cultivated a "food plot" for deer, and hunted on the Disputed Property.  *See* Hr'g Tr. 171:01–:14 (Mar. 17, 2025).  Natalie Coupel also testified that she and her grandchildren occasionally walk down the Road and pick blackberries.  *See* Hr'g Tr. 165:24–166:04 (Mar. 17, 2025).

## CONCLUSIONS OF LAW

The Falterman Heirs' Petition seeks a declaratory judgment finding (i) that the Falterman Heirs are and have been in possession of the Disputed Property (Count 1); (ii) that the Falterman Heirs are and have been owners of the Disputed Property (Count 2); (iii) that the boundaries of the Disputed Property are as shown in the Taracena Survey (Count 3); (iv) the extent to which the Coupels own the Road (Count 4); and (v) that the Falterman Heirs have a predial servitude to access the Disputed Property by use of the Road (Count 5).  [ECF Doc. 1].   The Coupels filed an Answer to the Complaint, asserting that contend that they acquired title of the Disputed Property from the Thibodeauxs via the 2003 Act of Sale.  *See id*.  Alternatively, the Coupels assert that they

acquired title to the Disputed Property via acquisitive prescription because they have possessed the property in good faith since 2003 (the "Counterclaim").[7]

### A.   The Petition Is Properly Characterized As A Declaratory Judgment.

As an initial matter, the Falterman Heirs and the Coupels dispute whether the Petition is properly characterized as a request for declaratory relief, a petitory action, or a possessory action.

"[E]very pleading must be construed as to do substantial justice[;] [a]ccordingly, courts look beyond mere headings and terminology used on or in pleadings to determine the circumstances and the true nature of the suit." *Heirs of John Beckwith LLC v. Sims*, 315 So.3d 306, 314 (La. App. 4th Cir. 2021); *see also Parker v. Machen*, 567 So. 2d 739, 743 (La. App. 2d Cir. 1990) ("The instant judgment, understood as declarative of the ownership of the land, was appropriate under the broad relief contemplated by art. 3654.").

"The possessory action is one brought by the possessor or precarious possessor of immovable property or of a real right therein to be maintained in his possession of the property or enjoyment of the right when he has been disturbed, or to be restored to the possession or enjoyment thereof when he has been evicted." LA. CODE CIV. PROC. ANN. art. 3655. "The petitory action is one brought by a person who claims the ownership of, but who does not have the right to possess, immovable property or a real right therein, against another who is in possession or who claims the ownership thereof adversely, to obtain judgment recognizing the plaintiff's ownership." LA. CODE

---

[7]   The Court notes that the Coupels did not assert any counterclaim in their Answer to the Petition. [ECF Doc. 1]. But "Louisiana's Code of Civil Procedure uses a system of pleading based upon the narration of factual allegations." *Scott v. Sneed*, 210 So. 3d 872, 874 (La. App. 2 Cir. 2006) (citing *Miller v. Thibeaux*, 159 So.3d 426, 431 (La. 2015)). "[A] final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief." LA. CODE CIV. PROC. ANN. art. 862; *see also Miller*, 159 So.3d at 431–32. The primary assertions in the Petition concern title and possession of the Disputed Property. The Court finds that the assertions filed by the Coupels constitute a counterclaim for title and possession of the Disputed Property.

CIV. PROC. ANN. art. 3651. But "[a] plaintiff who is in possession of the property at issue can bring an action for declaratory judgment, thereby raising issues of possession and ownership in the same action." *Lafourche Realty Co. v. Duard Eymard Co.*, 638 So. 2d 1138, 1139 (La. App. 1 Cir. 1994). In a declaratory judgment, the Court "may declare rights, status, and other legal relations whether or not further relief is or could be claimed [and] [t]he declaration shall have the force and effect of a final judgment or decree." LA. CODE CIV. PROC. ANN. art. 1871. Indeed, where the plaintiff alleges in its declaratory action that it is in possession of the subject property the Complaint is best characterized as an action for declaratory relief. *Lafourche Realty Co.*, 638 So. 2d at 1139.

Although the Falterman Heirs did not fashion the Petition as a declaratory action, it is clear from the pleading that they seek declaratory relief. The Falterman Heirs allege in the Petition that they are in possession of the Disputed Property, and they seek determinations regarding such possession, ownership, and servitude. [ECF Doc. 1]. Thus, the Petition is properly characterized as a declaratory judgment.

### B.    The Falterman Heirs Own And Possess The Disputed Property.

Counts 1 and 2 of the Petition ask this Court for a determination that the Falterman Heirs own and possess the Disputed Property. [ECF Doc. 1]. When determining ownership of real property in a declaratory action, the Court makes the following assessment:

> (1) If the party who would be entitled to the possession of the immovable property or real right therein in a possessory action has been in possession for one year after having commenced possession in good faith and with just title or has been in possession for ten years, the court shall render judgment in favor of that party, unless the adverse party proves that he would be entitled to a judgment recognizing his ownership in a petitory action under Article 3653(A)(1).

> (2) In all other cases, the court shall render judgment in favor of the party who proves better title to the immovable property or real right therein.

LA. CODE CIV. PROC. ANN. art. 3654.

        *1.  The Falterman Heirs have satisfied their burden under article 3654(1) to be entitled to a declaration of ownership of the Disputed Property.*

The Falterman Heirs can establish ownership of the Disputed Property by showing (1) that they would be entitled to possession of the Disputed Property in a possessory action and (2) that they (a) have been in possession of the Disputed Property for one year in good faith and with just title or (b) have been in possession of the Disputed Property for ten years.

"In order to maintain a possessory action a party must establish that he has possessed the property quietly and without interruption for more than a year prior to a disturbance." *Faust v. Mitchell Energy Corp.*, 437 So. 2d 339, 342 (La. App. 2d Cir. 1983); *see also* LA. CODE CIV. PROC. ANN. art. 3658. "To acquire possession, one must intend to possess as owner and must take corporeal possession of the thing." LA. CIV. CODE ANN. art. 3424. Corporeal possession requires "physical acts of use, detention, or enjoyment over a thing." LA. CIV. CODE ANN. art. 3425. Further, "[p]ossession may be exercised by the possessor or by another who holds the thing for him and in his name. Thus, a lessor possesses through his lessee." LA. CIV. CODE ANN. art. 3429; see also *Manson Realty Co. v. Plaisance*, 196 So. 2d 555, 556 (La. App. 4 Cir. 1967) (holding that record owner of property that granted a pipeline servitude to mineral exploration company which laid and maintained pipeline for years continued corporeal possession of property). Once possession has been established, it is "retained by the intent to possess as owner even if the possessor ceases to possess corporeally." LA. CIV. CODE ANN. art. 3431.

As long as there is no interruption of possession, a transferee who receives title to a property from a transferor also receives the possession of that transferor. *See* LA. CIV. CODE ANN. arts. 3441 & 3442. Interruption of possession occurs either when the possessor ceases to intend to possess as the owner, or when the possessor is evicted and fails to recover possession within one

year.  *See* LA. CIV. CODE ANN. arts. 3433–3435.  Once the right to possess has been established, possession is only lost "when the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation." LA. CIV. CODE ANN. art. 3433.  To interrupt a party in possession, the adverse party must demonstrate that it has conducted some activity on the property which seriously calls into question the ownership of the property.  *See Mire v. Crowe*, 439 So. 2d 517, 522 (La. App. 1 Cir. 1983).  Sporadic hunting or occasional walks on a property is insufficient to interrupt possession.  *See id.* at 523; *see also Heirs of John Beckwith LLC*, 315 So.3d at 330.

Here, the Court finds that the Falterman family has held title and continuous possession of the Disputed Property since 1914.  *See* Hr'g Tr. 19:22–64:11 (Mar. 17, 2025).  Sheldon Falterman bought the Disputed Property at a sheriff's sale in 1914.  Since then, the Falterman family has continuously exercised corporeal possession over the Disputed Property.  Sheldon Falterman initially used the Disputed Property as a pasture; later, he leased the Disputed Property to sugar cane farmers and, after that, to mineral exploration companies.  Humble Oil, a lessee, constructed the Oil Field Road across the Disputed Property under Sheldon Falterman's authority.  When Sheldon Falterman died in the early 1960s, the Disputed Property transferred by succession to his two sons, Lester Falterman and Tenance Falterman.  After Lester and Tenance died, title again transferred by succession to the Falterman Heirs.  The Falterman Heirs continued to farm on the Disputed Property until 1973.  Following the 1973 flood, the Falterman Heirs camped and hunted on the property, built structures on the property, and executed four more oil and mineral leases. Since 1914, the Falterman family has paid all annual property taxes, save for one year.

Nothing in the record reveals any challenge or interruption to the Falterman Heirs' possession of the Disputed Property.  When the Coupels entered the picture in 2003, the Falterman

24

Heirs had both title and possession of the Disputed Property.[8]  Because the Falterman Heirs had possession of the Disputed Property for more than one year prior to the initiation of this dispute, the Coupels must show eviction by force or usurpation, rather than a mere disturbance of possession.  *See*  LA. CIV. CODE art. 3433.  The record shows that the Coupels occasionally used the Disputed Property for hunting.  Such use does not amount to an eviction sufficient to interrupt the Falterman Heirs' possession.  Thus, the Court finds that the Falterman Heirs have satisfied their burden under article 3654(1) to be entitled to a declaration of ownership of the Disputed Property.

> 2.  *The Coupels cannot prove that they would be entitled to a judgment recognizing their ownership of the Disputed Property in a petitory action under article 3654(1).*

Because the Court has found that the Falterman Heirs have held title and possession of the Disputed Property since 1914, the Coupels must "prove that [they have] acquired ownership from a previous owner" or "prove a better title thereto than the defendant in all other cases" to prevail here.  LA. CODE CIV. PROC. ANN. arts. 3653(A)(1) & (2); *see also Pure Oil Co. v. Skinner*, 294 So. 2d 797, 799 (La. 1974) ("The statutory imposition of a higher burden of proof than simply proving better title when an adverse claimant is in possession of disputed land leads to the inevitable conclusion that respondent's burden was to 'make out his title thereto.'   In other words, respondents were required to prove valid record title, to show title good against the world without regard to the title of the party in possession." (citing LA. CODE CIV. PROC. ANN. arts. 3653 & 3654)).  As explained further by a Louisiana appellate court:  "The plaintiff in a petitory action against a defendant in possession makes out his title when he proves his ownership either by an

---

[8]      Indeed, within five months of the Coupels' 2003 Act of Sale transaction, Anthony Falterman leased use of the Disputed Property to Talbot Properties.  *See* Hr'g Tr. 51:04–52:5 (Mar. 17, 2025); Plaintiffs Ex. A17.

unbroken chain of valid transfers from the sovereign or an ancestor in title common with the defendant; acquisitive prescription of 10 or 30 years will suffice." *Whitley v. Texaco, Inc*., 434 So. 2d 96, 201 (La. App. 5 Cir. 1982).

The record is devoid of evidence that would show the Coupels hold valid record title, that is, "title good against the world without regard to the title of the party in possession." *Skinner*, 294 So.2d at 799.  Nothing in the record shows that valid record title of the Disputed Property was ever transferred to the Coupels.   Without evidence of each link in the chain of title for the Disputed Property, the Coupels fail to meet their burden under article 3653(A)(1).  Likewise, the Coupels have failed to demonstrate that they have acquired the Disputed Property via ten-year acquisitive prescription.[9]  For the reasons discussed in Subpart B.1 *supra*, the record before the Court conveys that the Coupels have not possessed the Disputed Property for **any** amount of time.[10]

---

[9]     The Coupels do not claim to have possessed the Disputed Property for more than thirty years, so the thirty-year acquisitive prescription standard is not implicated here.

[10]    Assuming *arguendo* that the Coupels' limited activities on the Disputed Property constitute possession of the Disputed Property for a period of ten years, the Court finds that they did not do so in good faith or with just title.  "For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is owner of the thing he possesses."  LA. CIV. CODE ANN. art. 3480.  "Good faith is presumed."  LA. CIV. CODE ANN. art. 3481.  To defeat the presumption of good faith, it must be shown "that the possessor knows, or should know, that he is not owner of the thing he possesses."  *Id.*

The mere fact that land was purchased by a quitclaim deed is not necessarily an indication that the purchaser lacked good faith.  *See, e.g.*, *Land Dev. Co. of La. v. Schulz*, 124 So. 125, 128 (1929).  But "where a deed itself indicates that a seller may not own the entirety of the property conveyed" good faith is not presumed.  *See Bd. of Comm'rs. of Caddo Levee Dist. v. S. D. Hunter Found.*, 354 So. 2d 156, 162 (La. 1977).

Here, the Coupels' good faith cannot be presumed.  The 2003 Act Of Sale lists sixteen arpents of land that the Coupels purchased from the Thibodeauxs and does not expressly include any description that includes the Disputed Property.  In the years after the 2003 Act of Sale, Natalie Coupel became irritated that members of the public continued to use the Road which she believed she owned; at that time, she began to conduct independent research into the land records to determine ownership of the Road and obtained the 2006 Quitclaim Deed to leverage her position.  Once sued by the Falterman Heirs, she began to assert that the 2003 Act of Sale conveyed more than sixteen arpents.  At each stage of their encroachment on neighboring properties, the Coupels were met with resistance from the Faltermans, Kfourys, and other neighboring landowners.  Objectively, the Coupels could not have reasonably believed that they owned the

> 3. To the extent a finding is required, the Court finds that the Falterman Heirs
> have proven better title to the Disputed Property pursuant to article 3654(2).

Again, when determining ownership of real property in a declaratory action, the Court

makes the following assessment:

> (1) If the party who would be entitled to the possession of the immovable property
> or real right therein in a possessory action has been in possession for one year after
> having commenced possession in good faith and with just title or has been in
> possession for ten years, the court shall render judgment in favor of that party,
> unless the adverse party proves that he would be entitled to a judgment recognizing
> his ownership in a petitory action under Article 3653(A)(1).
>
> **(2) In all other cases, the court shall render judgment in favor of the party who
> proves better title to the immovable property or real right therein.**

LA. CODE CIV. PROC. ANN. art. 3654 (emphasis added).  The Court has already found that the

Falterman Heirs have met their burden under article 3654(1) to be declared owner of the Disputed

Property.  As to article 3654(2), and for the reasons discussed above, the Court also finds that the

Falterman Heirs have proven better title to the Disputed Property.

**C.     The Court Finds That the Teracena Survey Reflects and Confirms the
Boundaries of Property Owned by The Falterman Heirs.**

Count 3 of the Petition asks this Court for a determination that the boundaries to the

property owned by the Falterman Heirs are as shown in a survey attached to the Petition completed

by the late surveyor, Harold Taracena.  [ECF Doc. 1].

At trial, the Coupels stipulated to the admission as evidence of a certified copy of the

property survey completed and recorded in the Assumption Parish public records by Harold

Taracena (the "Taracena Survey").  *See* Hr'g Tr. 58:15–61:3 (Mar. 17, 2025); Plaintiffs Ex. C.

---

Road or the Disputed Property.  Thus, the Court cannot find that the Coupels possessed the Disputed
Property in good faith.

And for the reasons discussed in Subpart B *supra*, the Court finds that the Falterman Heirs, not the
Coupels, hold just title over the Disputed Property.

After the property dispute with the Coupels arose, the Falterman Heirs retained Mr. Taracena to survey and confirm the boundaries of property owned by the Falterman Heirs.  *See* Hr'g Tr. 58:15–61:3 (Mar. 17, 2025).  They chose Mr. Taracena knowing that he had surveyed neighboring properties in a dispute between the Coupels and the Kfoury family and was familiar with the location of the Disputed Property.  *See* Hr'g Tr. 58:15–61:3 (Mar. 17, 2025).  Anthony Falterman met with Mr. Taracena and reviewed the family's title transfer deeds for the Disputed Property.  *See* Hr'g Tr. 58:15–61:3 (Mar. 17, 2025); Plaintiffs Exs. A1–A5.

Given the Court's disregard of the Woodard Survey, the Taracena Survey stands as unchallenged and unopposed competent evidence.  The Court finds that the Taracena Survey reflects and confirms the boundaries of property owned by the Falterman Heirs.

**D.** **A Valid Servitude of Right of Way Exists in Favor of the Falterman Heirs To Use The Road To Access The Disputed Property.**

Count 4 of the Petition asks this Court for a determination of "the extent to which, if any, that [the Coupels] have ownership of the [R]oad that has historically been used to access Plaintiff's property."  [ECF Doc. 1].  Count 5 of the Petition asks this Court for a determination that the Falterman Heirs possess a right of passage to access the Disputed Property via the Road.  *See id.*

"A predial servitude is a charge on property, the servient estate, for the benefit of another, the dominant estate."  *Nola Bourbon, LLC v. Rodriguez-Franco*, 324 So. 3d 709, 717 (La. App. 4 Cir. 2021) (citing LA. CIV. CODE ANN. art. 646).  As an initial matter, the Court is unconvinced that the Coupels own the Road and, therefore, are the owners of the "servient estate."  The Court is aware that other courts have ruled on property boundaries between the Coupels and other neighbors.  *See, e.g.*, *Coupel v. Kfoury (In re Coupel)*, No. 25-30048, 2025 WL 3092766 (5th Cir. 2025); *Kfoury v. Coupel*, No. 2010-1254, 2011 WL 766960 (La. App. 1 Cir.), *writ denied*, 63 So. 3d 1000 (La. 2011).  That said, the record is insufficient for the Court to rule on the extent to which

28

the Coupels own all or part of the Road and, therefore, must deny the relief sought in Count 4.

Court will assume that the Coupels own the servient estate here only for purposes of assessing

whether the Falterman Heirs have met their burden by a preponderance of evidence to show they

have acquired an apparent predial servitude by acquisitive prescription. *See Delacroix Corp. v.*

*Perez*, 794 So. 2d 862, 865 (La. App. 4 Cir. 2000).

 "Predial servitudes are either apparent or nonapparent." *Id*. (citing La. Civ. Code Ann.

art. 707).[11] "The practical significance of the division of predial servitudes into apparent and

nonapparent relates to the rules governing the creation of servitudes. Nonapparent servitudes may

only be acquired by title; whereas, apparent servitudes may be acquired by title, by destination of

the owner, or by acquisitive prescription." *Id.* (quoting 4 La. Civ. L. Treatise, Predial

Servitudes § 1:13 (4th ed.)). This case implicates the Falterman Heirs' exercise of a right of way

over the Road that allows access to the Disputed Property. According to the uncontested evidence,

the Road has existed since at least the 1830s and, as of the early 1900s was routinely used to herd

and move cattle. In the 1950s, as the Falterman family leased the Disputed Property and other

property for mineral exploration, Humble Oil, with the family's permission, extended the Road

---

[11]     As explained by one commentator:

The classification of a particular servitude as apparent or nonapparent depends on facts and circumstances rather than on the nature of the servitude. Thus, a servitude of right of way may be apparent or nonapparent. If the right of way is exercised over an arid tract of land, without a trace, the servitude is nonapparent; if it is exercised on a paved road or a railway track, the servitude is apparent. . . . Certain kinds of servitudes are apparent almost by necessity. Such are the servitudes of view on common walls, of drip, of support, and servitudes for the maintenance of a levee. Other kinds of servitudes are nonapparent also by necessity. For example, such are the negative servitudes, the building restrictions in a subdivision, and the prohibitions of building on a neighboring estate.

4 La. Civ. L. Treatise, Predial Servitudes § 1:13 (4th ed.).

past the Disputed Property to the Attakapas Canal.  The Court characterizes the servitude implicated in this case as an apparent predial servitude.

"The laws governing acquisitive prescription of immovable property apply to apparent servitudes."  LA. CIV. CODE ANN. art. 742.  "An apparent servitude may be acquired by peaceable and uninterrupted possession of the right for ten years in good faith and by just title; it may also be acquired by uninterrupted possession for thirty years without title or good faith."  *Id.*  The latter condition is the standard here and may be shown by direct or circumstantial evidence.  *See Frith Farms DeSoto Parish Interest P'ship, L.L.P. v. Lee*, 284 So. 3d 1247, 1253 (La. App. 2 Cir. 2019) ("The intent to possess as owner may be inferred from all the surrounding facts and circumstances.")

The uncontested evidence reveals that the Falterman Heirs have accessed the Road uninterrupted and unimpeded since the 1950s.  Thus, the Court finds that, as early as the 1980s, the Falterman Heirs established via acquisitive prescription their right to a predial servitude over the Road that allows access to the Disputed Property.  If the Coupels purchased the Road, they did so at the earliest via the 2003 Act of Sale, subject to the Falterman Heirs' pre-existing predial servitude on the Road.  *See* LA. CIV. CODE ANN. art. 650(B) ("The predial servitude continues as a charge on the servient estate when ownership changes."); *Cazes v. Robertson*, 421 So. 2d 423, 425 (La. App. 1 Cir. 1982).

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Court **GRANTS** declaratory judgment in favor of the Falterman Heirs on Counts 1 and 2 of the Petition and finds that the Falterman Heirs own and possess the Disputed Property.

**IT IS FURTHER ORDERED** the Court **GRANTS** declaratory judgment in favor of the Falterman Heirs on Count 3 of the Petition and finds that the Taracena survey defines the boundaries of property owned by the Falterman Heirs.

**IT IS FURTHER ORDERED** that the Court **DENIES** declaratory judgment on Count 4 of the Petition regarding the extent to which the Coupels own all or part of the Road.

**IT IS FURTHER ORDERED** that the Court **GRANTS** declaratory judgment in favor of the Falterman Heirs on Count 5 of the Complaint and finds that the Falterman Heirs established their right to a predial servitude over the Road that allows access to the Disputed Property.

**IT IS FURTHER ORDERED** that the Court **DENIES** the Coupels' Counterclaim.

A separate judgment on the Complaint consistent with this Memorandum Opinion and Order will be entered contemporaneously and in accordance with Bankruptcy Rules 7054 and 9021.

New Orleans, Louisiana, December 31, 2025.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE